**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

SAMMIE LEON LAWRENCE IV,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER, COLORADO, a municipality,
SERGEANT SHAWN SAUNDERS, in his individual capacity,
OFFICER KENNETH BRIDGES, in his individual capacity,
OFFICER JACKSON BURKIN, in his individual capacity,
OFFICER BRENT CAIRNS, in his individual capacity.

      Defendants

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff Sammie Leon Lawrence IV, through his counsel, Daniel D. Williams of HUTCHINSON, BLACK AND COOK, LLC, and Darren O'Connor of O'CONNOR JONES: A PEOPLE'S LAW OFFICE, LLC, file this Complaint and Jury Demand and aver as follows:

**<u>INTRODUCTION</u>**

      1.     This is an action that goes to the heart of the United States Constitution: a citizen's right to freedom of speech and to be free of excessive force and unreasonable seizures. It arises from the Denver Police Department's violent arrest of an African American man when he lawfully and respectfully exercised his right to protest after the killing of George Floyd.

      2.     Mr. Lawrence was present at the pedestrian promenade at 16th Street and Platte Street in Denver on May 28, 2020, when Denver Police Department (hereinafter "DPD") Officer Burkin instructed Mr. Lawrence and an unidentified woman to move into the street.

1

3.      Mr. Lawrence complied with Officer Burkin's instructions and moved into the street.

4.      The unidentified woman did not, and walked back onto the promenade. Sergeant Saunders, who appeared to be directing the officers on scene, directed DPD Officer Bridges to fire a less-lethal round at her. The shot caused her to step back into the roadway, where Mr. Lawrence remained and the two of them had been directed to stand.

5.      Mr. Lawrence then walked to the edge of the roadway where he had been instructed to stand, but did not enter the promenade.

6.      Sergeant Saunders responded by directing Officer Bridges to shoot Mr. Lawrence at close range with less-than-lethal munitions. Officer Bridges did so multiple times, after which Officers Burkin and Cairns arrested Mr. Lawrence.

7.      There was no lawful reason for DPD Officer Bridges to shoot Mr. Lawrence – it certainly was not necessary to protect anyone or to effect an arrest. Mr. Lawrence consistently maintained a calm demeanor prior to and even while Officer Bridges shot him at short range. He did not resist when arrested. The decision to shoot Mr. Lawrence appears to be purely punitive for his engaging in protests against police violence.

8.      After DPD shot and began to arrest Mr. Lawrence, the crowd responded by becoming more confrontational with the police. That included, after Mr. Lawrence being shot, a DPD motorcycle getting knocked over. Thus, it appears DPD's decision to shoot Mr. Lawrence and the unidentified woman with pepper munitions, and to arrest Mr. Lawrence for doing nothing wrong other than lawfully protesting, escalated events at the scene and left everyone at the scene less safe as a result.

## PARTIES

9.      At the time of his arrest, Plaintiff Sammie Leon Lawrence IV was a resident of and domiciled in Boulder, Colorado.

10.     Defendant City and County of Denver, Colorado (hereafter "Denver") is a home-rule municipality incorporated in the State of Colorado.

11.     Defendant Sergeant Shawn Saunders is or was at all relevant times a supervisory employee of the DPD and acting under color of law. Defendant Saunders is being sued in his individual capacity.

12.     Defendant Officer Kenneth Bridges is or was at all relevant times an employee of the DPD and acting under color of law. Defendant Bridges is being sued in his individual capacity.

13.     Defendant Officer Jackson Burkin is or was at all relevant times an employee of the DPD and acting under color of law. Defendant Burkin is being sued in his individual capacity.

14.     Defendant Officer Brent Cairns is or was at all relevant times an employee of the DPD and acting under color of law. Defendant Cairns is being sued in his individual capacity.

## JURISDICTION AND VENUE

15.     This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983 and § 1988. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b), (e)(1). All of the events alleged herein and giving rise to the claims occurred within the District of Colorado.

## FACTUAL ALLEGATIONS

**A. Mr. Lawrence Joins a Protest in Denver as the Murder of George Floyd Shocks the National Conscience and Outraged Americans Assemble Across the Nation.**

3

16.     May 28, 2020, marked the first day of widespread demonstrations protesting the killing of and brutality against Black people across the country. National protests had begun, *inter alia*, after Breonna Taylor, a Black woman from Kentucky, was killed by police officers on March 13, 2020. Protests grew in size and frequency after a police officer in Minnesota murdered George Floyd on May 25, 2020.

17.     Minneapolis police officers responded to a convenience store employee's call that alleged Mr. Floyd had used a counterfeit bill to make a purchase. Officers pinned Mr. Floyd to the ground, and Officer Derek Chauvin put his knee on Mr. Floyd's neck for nearly nine minutes. During that time, fellow officers did nothing to interfere with Officer Chauvin, and instead focused on bystanders who verbally challenged and recorded the police brutality taking place in front of their eyes. Mr. Floyd repeatedly stated, "please," that he could not breathe, "Mama," and "Mama I love you."

18.     Despite Mr. Floyd's pleas to the officers, Officer Chauvin continued to keep his knee on Mr. Floyd's neck for nearly three minutes after Mr. Floyd became unresponsive. He was taken to Hennepin County Medical Center, where he was pronounced dead. As news and bystander video reached television and social media, people took to the streets en masse to protest the vicious extrajudicial police killing of yet another Black man.

**B. Plaintiff Sammie Lawrence Joins the First Denver Protest in Response to George Floyd's Murder.**

19.     Mr. Lawrence is a soft-spoken African-American man and was a member of the National Association for the Advancement of Colored People Boulder County Branch.

20.     According to the DPD's report, Mr. Lawrence is diminutive in stature, standing at 5'7", and weighs about 154 pounds.

21.     On May 28, 2020, Mr. Lawrence was present at 16th Street and Platte Street in Denver at approximately 7:00 p.m., well before nightfall.  At that location, 16th Street is a pedestrian promenade leading to a footbridge over I-25 about a block to the West.  A picture of the intersection is below:



22.     Mr. Lawrence wore a business suit jacket and necktie and lawfully stood on the 16th street pedestrian promenade pictured above, on the west side of Platte Street. To his east, a group of protesters assembled across the street, as seen in the image taken from police body camera video, below:



23.     The video of the incident shows that at this time, the crowd of protesters was peaceful. Bodycam video of the incident shows that a woman was standing with her hands up next to Mr. Lawrence as Mr. Lawrence was speaking with a police officer. The police pointed a weapon at her. On the video Mr. Lawrence is captured asking, "Are you really trying to do that?"

24.     About fifteen seconds later, Officer Burkin placed his hands on and instructed Mr. Lawrence to get back into the street.

25.     Sergeant Saunders simultaneously also moved the woman who was standing next to Mr. Lawrence into the street.

26.     Mr. Lawrence complied with Officer Burkin's instructions.

**C. Plaintiff Lawrence is Shot With Less-Lethal Munitions and Arrested.**

27.     Shortly after Mr. Lawrence and the woman were moved into the street, the woman, with raised arms, moved back onto the sidewalk promenade, while Mr. Lawrence remained in the roadway as directed. This is seen in the body camera image below:



28.    At that time, after the woman had walked back onto the promenade, Denver Police Sergeant Saunders directed Denver Police Officer Bridges to fire a pepper bullet at her. In response she stepped back into the street, where Mr. Lawrence remained and where the two of them had been instructed to stand.

29.    Mr. Lawrence then stepped to the edge of the street – but notably did not enter the pedestrian promenade as the woman who had just been shot had done. This is confirmed by the arresting officer's Statement Of Probable Cause, which states that when he was arrested, "Lawrence was standing in the traffic lane."

30.    Despite Mr. Lawrence's continued compliance with Officer Burkin's instructions and Mr. Lawrence's continued peaceful demeanor, Sergeant Saunders directed Officer Bridges to fire on Mr. Lawrence with pepper bullets. The instruction was a combination of verbal exclamations of "right here, right here," and pointing his baton at Mr. Lawrence.

31.     Neither Sergeant Saunders nor Officer Bridges warned Mr. Lawrence that Officer Bridges intended to shoot him, nor did they give Mr. Lawrence a command that he failed to obey before Officer Bridges shot him.

32.     Mr. Lawrence posed no threat to the police officers on scene, or to anyone else, when Defendants decided to shoot him.

33.     In response to Sergeant Saunders's verbal and physical directions, Officer Bridges shot Mr. Lawrence repeatedly with pepper bullets. The first image below, captured from Officer Burkin's body camera video, shows Officer Bridges firing on Mr. Lawrence. The second image shows the resultant chemical residue on Mr. Lawrence:





34.     After he was shot with pepper bullets, Mr. Lawrence was arrested, and ultimately charged with the municipal offense of disobeying a lawful order in violation of D.R.M.C. 38-31(c).

35.     The probable cause statement and police reports for the incident paint a damning narrative in support of Mr. Lawrence's arrest. That narrative, however, is belied by the video evidence.

36.     According to the probable cause statement, the arrest was made after an unruly crowd "began throwing bottles and rocks at Officer's [sic]," and "[a] Denver Police Motorcycle was pushed over by a protester and [after] numerous protesters had the high ground over the Officer's [sic] posing a safety issue." None of that was true.

37.     As Officer Burkin's body camera video shows, Mr. Lawrence was shot and arrested **before** the throwing of objects or the pushing over of the motorcycle. Likewise, the claim that there were protesters on "high ground" is belied by the video.

38.     The probable cause statement goes on to claim that Mr. Lawrence:

> was given numerous lawful orders to move back to the east side of
> the Platte St from Officer's [sic] who were in full Police Uniform.
> Lawrence was standing in the traffic lane while refusing the lawful
> orders to move back. Lawrence refused to move after given [sic] the
> orders and was taken into custody.

39.     As the bodycam video documents, however, Mr. Lawrence was ordered to "get back into the street," and he complied with that command. The description of "Lawrence . . . standing in the traffic lane" comports with the actual order he was given to "get back into the street."

40.     Though voices can be heard in Officer Burkin's video saying to other protesters: "back up," Officer Burkin and Sergeant Saunders were near Mr. Lawrence when Sergeant Saunders directed Officer Bridges to fire on Mr. Lawrence. None of the three directed such an order to Mr. Lawrence.

41.     One of the police reports that document the incident states that Mr. Lawrence "entered the street and approached officers with a large group of other people." The bodycam video proves that neither of those events occurred.

42.     While Mr. Lawrence was being arrested and while he was in the custody of Denver police officers, bodycam footage reveals that a person ran up and pushed over a Denver Police motorcycle. Thus, because Mr. Lawrence was already in custody by that time, the pushing over of the motorcycle could not have contributed to the decision to shoot Mr. Lawrence or to arrest him.

43.     Also during his arrest, the protesters began chanting and yelling at the officers, including cries of "I can't breathe," to which Officer Burkin says "we've gotta get him [Lawrence] out of here."

44.     Officer Burkin then asked another law enforcement officer on scene, "What do we want to do with our boy in the back?" "Boy" is a pejorative term for a Black man.

45.     At around that time, numerous white non-protesters approach the position where Mr. Lawrence had been arrested without the police issuing any orders to them, shooting them with pepper balls, or threatening to arrest or in fact arresting any of them. An example is shown in the image below of a white man standing very near where Mr. Lawrence had been. The image is taken from the body camera video while Mr. Lawrence is in the police car, and the then-overturned motorcycle can be seen in the image.



**D. The Pepper Munitions Denver Used Against Plaintiff are Dangerous and Some Police Forces Have Discontinued Their Use.**

46.     In confronting Mr. Lawrence and others on May 28, 2020, DPD officers used pepper ball munitions so liberally that toward the end of the incident they laughed and complained that they had exhausted their supply of the munitions.

47.     Days later, on Thursday, June 4, 2020, four persons who participated in the Denver protests sued Denver alleging that DPD officers' use of "less-lethal" weapons violated the First and Fourth Amendments. After a hearing on the matter, United States District Court Judge R. Brooke Jackson of the United States District Court for the District of Colorado issued a temporary restraining order restricting DPD from using "less-lethal" projectiles and chemical agents on peaceful protesters.

48.     In doing so, this Court noted that "people have an absolute right to demonstrate and protest the actions of governmental officials, including police officers. It is one of the many freedoms on which this country was built." In response to the evidence presented, this Court was unequivocal about the behavior of DPD officers toward protesters, calling it "disgusting."

49.     Mr. Lawrence was shot with pepper balls that were fired from air-powered launch devices that deploy plastic sphere projectiles filled with powdered Oleoresin Capsicum (OC).[1] The plastic spheres explode on contact and expel powder onto the person who is shot, which causes the person to struggle to breathe and be covered in the powder. The images below show both the pepper ball projectiles and the devices used to deploy them.

---

[1] Operations Manual, Denver Police Department, https://www.denvergov.org/content/dam/denvergov/Portals/720/documents/OperationsManual/OMSBook/OM_Book.pdf.







50.     In addition to the burning effect of the OC contained in the pepper bullets, the

bullets themselves can cause serious injury—even death—because of the high velocity at which

they are shot. The launcher can shoot six to twelve pepper bullets per second at speeds up to 350 feet per second or more than 238 miles per hour.[2]

51.     The Boston Police Department suspended use of pepper balls in 2004 after a college student died as a result of a pepper ball projectile that struck her in the eye.[3]

52.     University of California, Davis police shot a pepper ball at an unarmed student while trying to break up a block party and permanently damaged his eye in 2004.[4]

**E.  Defendants Injured Plaintiff Lawrence.**

53.     Mr. Lawrence, after he was shot, was arrested and forced to spend a night in jail.

54.     Mr. Lawrence suffers from asthma and uses an inhaler.

55.     Mr. Lawrence experienced chest pain and was concerned he had suffered injury to his heart. The pain was intense enough that he could count his pulse because he could feel pain with every heartbeat.

56.     One day after his release from jail, he therefore sought medical attention at a hospital.

57.     Though he was not diagnosed with damage to his heart, Mr. Lawrence experienced bruising of his sternum, as seen in the image below.

---

[2] 2019 Product Catalog, PepperBall, https://www.pepperball.com/wpcontent/uploads/2019/01/PepperBall-2019-product-catalog.pdf.

[3] Jonathan Finer, *Boston Police Suspend Use of Pepper-Ball Guns*, WASH. POST (Oct. 24, 2004), https://www.washingtonpost.com/archive/politics/2004/10/24/boston-police-suspend-use-of-pepper-ball-guns/dd773f5d-1651-4c2a-8a82-b967d77958b5/.

[4] Maura Dolan, *Court rules police may be liable for pepper ball injuries*, L.A. TIMES (July 12, 2012), https://www.latimes.com/local/la-xpm-2012-jul-12-la-me-uc-davis-pepper-20120712-story.html.



**F.  Defendant Denver has a Custom, Policy and Practice of Using Excessive Force and Unlawfully Arresting Protesters.**

58.     Denver's own written use-of-force policy restricts the use of less-lethal pepper ball bullets only to situations when 1) it is necessary to "incapacitate, safely control, or take into custody an individual whose conduct rises to Defensive Resistance;"[5] 2) "its use is likely to prevent an officer or a third person from being injured by an individual;" or 3) "ordered by a field force commander or other command officer in crowd control or riot situations . . . ."

59.     By its very nature, this policy grants a command officer the power, in performance of crowd control, to order an officer or of to use pepper ball bullets regardless of the actions of the target. This represents an explicit Denver policy that allows police officers to use excessive force.

60.     Denver policymakers were deliberately indifferent to the violation of would-be and actual protesters' constitutional rights by explicitly and implicitly authorizing the use of less-

---

[5] Defensive Resistance is defined as "Physical actions that attempt to prevent an officer's control, including flight or attempt to flee but do not involve attempts to harm the officer (includes "turtling," which involves a pronated individual pulling his or her arms and/or legs to their chest to prevent access and control by an officer)."

lethal force, including pepper bullets, against protesters such as Plaintiff when protesters posed no threat of injury or threat of flight.

61.     Defendant Denver failed to discipline, supervise, and/or reprimand its officers for their routine use of pepper ball munitions against protesters when the protesters posed no threat of injury or threat of flight.

62.     In *Abay v. City of Denver*, 445 F. Supp. 3d 1286 (D. Colo. 2020), Plaintiffs alleged First and Fourth Amendment violations, including excessive use of force based on Denver and other law enforcement agencies using, *inter alia*, less-lethal force on May 28, 2020 against protesters. The Court reviewed body camera video of officers' use of force on other protesters, which includes videos taken on the same date as Plaintiff Lawrence was shot with pepper bullets and arrested. The Court issued an Order on Plaintiffs' Motion for Temporary Restraining Order, which concluded:

> I seek to balance citizens' constitutional rights against officers' ability to do their job. However, the time is past to rely solely on the good faith and discretion of the Denver Police Department and its colleagues from other jurisdictions. I believe in everything that Commander Phelan testified during tonight's hearing about the duty of the police to protect the rights of citizens who demonstrate and protest. **However, the Denver Police Depart has failed in its duty to police its own**.

*Id*. at 1294 (emphasis added).

63.     DPD officers' customary and ongoing use of the less than lethal weapons to target protesters for demonstrating evidences that Denver failed to adequately train its officers that less-than-lethal weapons cannot be used for the purpose of discouraging First Amendment activity, to punish those who engage in First Amendment activity, or to retaliate against those who engage in First Amendment activity.

64.     Denver final policymakers received notice that DPD officers were using less-than-lethal force against protesters to control and suppress demonstrations in the absence of any

imminent threat to safety, including 150 complaints about the DPD in one 72-hour period,[6]

condemnation from City Council members,[7] and widely publicized videos and firsthand accounts

circulated through the local, state, and international press.[8]

65.     On May 29, 2020, after the first day of protests, Denver's final policymakers

publicly ratified DPD officers' use of less-than-lethal force for crowd control at protests without

warning and DPD officers shooting less-than-lethal projectiles at protesters' heads, necks, and

chests.[9] For instance, Chief of Police Pazen stated that "[o]ur officers reacted to violent and

dangerous behavior . . ." and that "[o]ur officers showed great restraint throughout the evening

and took action when danger occurred . . . ."[10] This ratification gave DPD officers notice that their

actions firing on protesters were consistent with Denver custom, policy, and practice.

---

[6] Jesse Paul, *Complaints about police response to Denver's George Floyd protests under investigation as demonstrations hit day 6*, COLO. SUN (June 2, 2020), https://coloradosun.com/2020/06/02/denver-police-response-protests-under-investigation/.

[7] Conrad Swanson, *Denver City Council members call for investigation into police use of force during George Floyd protests*, DENVER POST (June 2, 2020), https://www.denverpost.com/2020/06/02/denver-city-council-investigate-police-force-protest/; Letter, Denver City Council, June 5, 2020, https://denver.cbslocal.com/wp-content/uploads/sites/15909806/2020/06/Denver-city-council-calls-for-review-of-DPD-use-of-force-policy.pdf.

[8] Lori Jane Gliha, *Police projectile fractures Denver protester's face; she says it was unprovoked*, KDVR (June 3, 2020), https://kdvr.com/news/local/police-projectile-fractures-denver-protesters-face-she-says-it-was-unprovoked; Alex Rose, *Local man needs eye removed after projectile hits his face during afternoon protest in Denver*, KDVR (June 3, 2020), https://kdvr.com/news/local/local-man-needs-his-eye-removed-after-projectile-hits-his-face-during-afternoon-protest-in-denver/?fbclid=IwAR2Q9RdYRmi3dp5GnuyOf6Tm6E-NoquhzKTvHSknBTmUKLuZ-17UIc4YJkA.

[9] Ana Campbell, *Denver law enforcement agencies have a long history of violence. A use-of-force policy is supposed to help*, DENVERITE (May 29, 2020), https://denverite.com/2020/05/29/denver-law-enforcements-long-sordid-history-of-violence/; Ryan Osborne, *Denver mayor, police chief say officers showed "restraint" during George Floyd protest*, DENVER CHANNEL (May 29, 2020), https://www.thedenverchannel.com/news/local-news/denver-mayor-police-chief-say-officers-showed-restraint-during-george-floyd-protest.

[10] Osborne, *supra* note 9.

66.     Further, Denver provided little to no training to officers on crowd control. Denver allowed officers who had no training on the use of kinetic impact projectiles (hereinafter "KIPs"), particularly pepper-ball guns, to use these weapons during the entirety of the protests. Denver provided no crowd control training to many officers who policed the protests outside of the training provided at the academy. A large number of officers told Denver's Independent Monitor that they had received inadequate training on crowd control.

67.     Defendant Denver failed to train its officers in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for such training. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors.

68.     Defendant Denver failed to adopt adequate policies in the constitutional responses to peaceful demonstrations, despite the history of such violations in the past and despite the obvious need for adequate policies. The recurrence of the same violations with respect to these protestors indicates an intentional refusal to preserve the constitutional rights of protestors.

69.     DPD and Defendant Denver have been called on numerous times dating back at least to 2011 to investigate their use of pepper balls and other chemical agents against protestors.

70.     After Denver police fired pepper balls at peaceful protestors on October 29, 2011, during the Occupy Denver demonstrations in Civic Center Park, Defendant Denver received several complaints and conducted an internal debriefing.

71.     Despite receiving notice of the DPD's unconstitutional actions, Defendant Denver and DPD deliberately chose not to conduct any further review of the department's less-than-lethal force policy, despite the patently unlawful way in which pepper-ball guns had been used against protestors and against the recommendation of the Office of the Independent Monitor, which

described the decision not to examine the incident and the underlying policies as a "missed opportunity."

72.     Despite receiving citizen complaints about DPD officers' excessive use of force during protests in the past, Defendant Denver has not disciplined any officers for their behavior at prior protests in at least the last five years.

73.     Defendant Denver's policy, practice, and custom of authorizing officers to use "less-lethal" weapons to control and suppress protests was the moving force behind the violations of Plaintiff's constitutional rights. The violations of Plaintiff's constitutional rights are a direct result of and caused by Defendant Denver's policy, practice, and custom of authorizing DPD officers to use less-than-lethal weapons to control and suppress protests.

74.     The Defendant officers' retaliatory arrest of Mr. Lawrence and prosecution were conducted pursuant to Denver Police Department's custom, policy and/or practice of arresting, detaining, and charging citizens who exercise their First Amendment right to criticize police conduct.

75.     For instance, on September 23, 2018, Brian Loma was arrested for shouting "fuck the police!" while protesting Denver Police Department's treatment of Denver's homeless citizens. Upon witnessing his friend being arrested for exercising his First Amendment right to free expression, Mikel Whitney began photographing the unlawful arrest. Officers demanded to know whether Mr. Whitney had taken photographs. When Mr. Whitney responded that he "did not take a fucking picture," officers arrested Mr. Whitney, as well.

76.     On July 5, 2018, Susan Greene, a citizen journalist, witnessed Denver Police Department officers arresting a naked man on the street. Ms. Greene began filming the arrest with her smartphone from a safe distance. When she refused to comply with officers' unlawful

commands that she cease filming, the officers arrested her in retaliation for her exercise of her First Amendment right to photograph the police on a public sidewalk. Ms. Greene's First Amendment and Fourth Amendment excessive force claims against Denver and DPD officers were settled in August 2019 for $50,000 along with required First Amendment training for DPD officers.

77.     This custom, policy, and/or practice was consciously permitted, authorized, or executed by the City and County of Denver. It reflects an intentional decision to choose from among various alternative courses of action and was a cause of the violations of constitutional rights described herein.

78.     No disciplinary action was taken against any of the Defendant officers for their retaliation against and unlawful arrest of Mr. Lawrence. The decision to refrain from any disciplinary action against officers who engage in unlawful conduct is part of a custom or practice of declining to discipline officers for constitutional violations. By declining to discipline Defendant officers for their unlawful actions, the City and County of Denver ratified their actions. This ratification demonstrates the actions were taken pursuant to the City's training and policies, and that such conduct is standard practice within the Denver Police Department.

79.     Defendant Denver failed to require that officers author use-of-force reports relating to each use of force during the entirety of the George Floyd protests. The only use-of-force reports were authored weeks after the protest. The complete and utter lack of a requirement that officers author use-of-force reports, which would then be reviewed by supervisors, is a basic aspect of supervision that Defendants failed to engage in.

80.     Defendant Denver failed to require that officers author reports relating to the use of chemical weapons during the entirety of the George Floyd protests. The first report outlining

what chemical weapons were used during the protest was authored on June 9, 2020. The complete and utter lack of a requirement that officers author reports documenting use of chemical weapons is a basic aspect of supervision that Defendants failed to engage in.

81.     Defendant Denver failed to track the munitions that were used by officers during the entirety of the George Floyd protests. The complete and utter lack of tracking the munitions used during the protests is a basic aspect of supervision that Defendants failed to engage in.

82.     Defendant Denver has only disciplined a few individuals for their actions during the George Floyd protests, despite rampant evidence that officers used grossly excessive force, failed to provide dispersal warnings and orders before using force, arrested individuals simply because they were protesting, failed to activate their body-worn cameras, and failed to document their uses of force throughout the protests. This lack of disciplinary action continuously indicated to officers that their actions were consistent with DPD custom, policy, and practice, and ensured that officers, like the Defendants who shot Mr. Lawrence, could use force against protesters without consequence.

83.     Upon information and belief, consistent with Denver's longstanding pattern in response to officers who use excessive force against protesters, and particularly its officers' use of force against protesters during the George Floyd protests, Denver did not impose *any* discipline against Defendant Bridges for using excessive force against Plaintiff, or Defendant Saunders, who authorized the use of excessive force against Plaintiff.

84.     Upon information and belief, Denver has provided no additional training to any officer related to the incident with Plaintiff.

85.     Through Denver's unlawful conduct of condoning the use of force against Plaintiff, Denver ratified the unconstitutional actions of its officers.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**First Amendment Violation — Freedom Of Speech And Assembly**
**(Plaintiff against All Defendants)**

86.     Plaintiff incorporates here by reference all of the preceding paragraphs.

87.     Defendants acted under color of state law with respect to the conduct described herein.

88.     Plaintiff was engaged in First Amendment-protected expression by gathering with others to protest police brutality.

89.     The actions of Defendants – specifically, the use of excessive force, false arrest, and vague and inconsistent orders without basis in law against peaceful protesters – can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

90.     Plaintiff's expression was on a matter of public concern.

91.     Plaintiff's expression occurred within a traditional public forum.

92.     Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression.

93.     Defendants responded to Plaintiff's First Amendment protected activity with retaliation, including but not limited to the use of physical force, including less-lethal pepper bullets, because they disagreed with the viewpoint being expressed by Plaintiff.

94.     Defendants' actions were not a reasonable time, place, and manner restriction on speech.

95.     At the time when Defendants stopped Plaintiff from speaking and gathering, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to gather, express himself, and speak freely.

96.     Any reasonable law enforcement officer knew or should have known of this clearly established right.

97.     Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

98.     Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

99.     Defendant Denver has a custom, practice or policy of tolerating violations of the First Amendment of the United States Constitution by DPD personnel.

100.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

101.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

102.    Defendant Denver failed to properly supervise and/or train its officers.

103.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses in amounts to be proved at trial.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment Violation —Unlawful Arrest**
**(Plaintiff against Defendants Denver, Burkin, and Cairns)**

104.    Plaintiff incorporates here by reference all of the preceding paragraphs.

105.    Defendants did not at any time have a reasonable basis for believing Mr. Lawrence disobeyed a lawful order.

106.    Defendants did not at any time have a warrant authorizing any search, seizure, or

detention of Mr. Lawrence's body or belongings.

107.   Defendants Denver, Burkin and Cairns had no probable cause to arrest Mr. Lawrence.

108.   At the time when Defendants Denver, Burkin and Cairns arrested Mr. Lawrence without probable cause, Mr. Lawrence had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in his person from unreasonable searches and seizures.

109.   Any reasonable law enforcement officer knew or should have known of this clearly established right.

110.   Defendants Burkin and Cairns acted pursuant to the custom, policy, or practice of Defendant Denver, which condones, tolerates, and ratifies its employees' continued arrests lacking in probable cause.

111.   Defendant Denver knew, or should have known, that their employees would continue to effectuate arrests that lack probable cause.

112.   Defendant Denver's policies, customs, and practices condoning its employees' continued arrests, which lack probable cause, were the moving force and proximate cause of the violation to Mr. Lawrence's constitutional rights.

113.   Defendant Denver was aware of widespread continued arrests, which lack probable cause, as detailed above, and failed to properly train or discipline its employees in response to these arrests.

114.   Defendants Denver, Burkin, and Cairns engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Mr. Lawrence's constitutional rights.

115.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions described above, Plaintiff suffered injuries, damages, and losses in amounts to be proved at trial.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment Violation — Excessive Force**
**(Plaintiff against Defendants Denver, Saunders, and Bridges)**

116.     Plaintiff incorporates here by reference all of the preceding paragraphs.

117.     Plaintiff had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

118.     Defendants Denver, Saunders and Bridges unlawfully used excessive physical force against Plaintiff, including through the use of less-lethal pepper bullets.

119.     Defendants Denver, Saunders and Bridges' actions were objectively unreasonable in light of the circumstances confronting them.

120.     Plaintiff gave the law enforcement personnel no reason to fear for their safety.

121.     Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

122.     Defendants Denver, Saunders and Bridges did not have, at any time, a legally valid basis to seize Plaintiff.

123.     Defendants recklessly created the situation in which they used force.

124.     Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

125.     At the time when Defendants Denver, Saunders and Bridges used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure from unreasonable seizure through excessive force.

126.    Any reasonable law enforcement officer knew or should have known of this clearly established right.

127.    Defendants Denver, Saunders, and Bridges engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

128.    Defendant Denver has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

129.    The actions of the Defendants Saunders and Bridges were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

130.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

131.    Defendant Denver failed to properly supervise and/or train its officers.

132.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described herein, Plaintiff suffered injuries, damages, and losses.

133.    The acts or omissions of Defendants Denver, Saunders and Bridges were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses.

134.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses in amounts to be proved at trial.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation — Due Process**
**(Plaintiff against All Defendants)**

135.    Plaintiff incorporates here by reference all of the preceding paragraphs.

136.    The orders issued by Defendants, and the authority on which those orders were based, were vague and not clearly defined.

137.    The orders issued by Defendants, and the authority on which those orders were based, offered no clear and measurable standard by which Plaintiff and others could act lawfully.

138.    Defendants lacked legal authority, through Denver municipal ordinance, state law, or otherwise, to order the dispersal of Plaintiff and, thereby, there were no explicit standards to govern the order of dispersal or limits on law enforcement's authority to order dispersal.

139.    Defendants failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

140.    The orders issued by Defendants, and the authority on which those orders were based, failed to provide people of ordinary intelligence a reasonable opportunity to understand what conduct they prohibited, and authorized or encouraged arbitrary and discriminatory enforcement, or both.

141.    At the time when Defendants violated Plaintiff's due process rights, Plaintiff had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be afforded due process of law.

142.    Any reasonable law enforcement officer knew or should have known of this clearly established right.

143.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

144.    Defendant Denver has a custom, practice or policy of tolerating violations of the Fourteenth Amendment of the United States Constitution.

145.     The actions of Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

146.     Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

147.     Defendant Denver failed to properly supervise and/or train its officers.

148.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

149.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses in amounts to be proved at trial.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Supervisory Liability for Violation of Constitutional Rights**
**(Plaintiff against Defendant Saunders)**

150.     Plaintiff incorporates here by reference all of the preceding paragraphs.

151.     Defendant Saunders personally directed, authorized, or controlled the actions of his subordinate officers, actions which violated Plaintiff Lawrence's constitutional rights complained of in the preceding counts.

152.     Defendant Saunders set in motion a series of events that he knew or reasonably should have known would cause others to deprive Plaintiff Lawrence of his constitutional rights.

153.     Defendant Saunders knew of and acquiesced in the constitutional violations committed by his subordinates. In so doing, Defendant Saunders disregarded known or obvious consequences of his actions, exhibiting deliberate indifference to Plaintiff Lawrence's rights.

154.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses in amounts to be proved at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against each Defendant, and award him all relief allowed by law, including but not limited to the following:

A.     Actual economic damages including but not limited to medical bills;

B.     Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

C.     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

D.     Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

E.     Pre-and post-judgment interest at the lawful rate; and

F.     Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 25th day of May, 2022.

 s/ Daniel D. Williams
Daniel D. Williams
**Hutchinson Black and Cook, LLC**
921 Walnut Street, Suite 200
Boulder, CO 80302

Telephone: (303) 442-6514
Facsimile: (303) 442-6493
williams@hbcboulder.com


  s/  Darren O'Connor
Darren O'Connor
**O'Connor Jones: A People's Law Office, LLC**
4450 Arapahoe Avenue, Suite 100
Boulder, CO 80303
Telephone: (720) 961-3869
darreno@dolawllc.com
*Attorneys for Plaintiff*